# THE STATE v. ARTHUR O. MEININGER, Appellant.

### Division Two, January 15, 1925.

1. **EMBEZZLEMENT: Several Transactions: Motion to Elect.** Where several items of money of the bank were turned over by the defendant cashier to one of its customers without security, it is not error to overrule a motion to compel the State to elect upon which of the several transactions shown by the embezzlement count of the indictment and covered by cash items, it would submit the case to the jury. And for the same reason it is not error to overrule a plea in abatement to the indictment and a motion to quash.

2. ————: **Conversion of Bank's Money: For Another's Benefit.** If the cashier of a bank knowingly permits or actively aids a customer to convert its money to his own use, with the fraudulent intent of depriving the bank of its money, he is guilty of embezzlement, and is to be held to be guilty of conversion, whether or not he actually received any of the money himself. The physical act of taking the money from the bank, or, what amounts to the same thing, the responsibility of the cashier for permitting the customer to obtain it, is the cashier's act, and because he obtained no part of it or any benefit therefrom it cannot be held, if he put the money out of the bank's control with a fraudulent intent, that he did not convert it to his own use.

3. ————: ————: ————: **Hazardous Ventures: No Security: Concealment.** In the prosecution of the cashier of a bank charged with embezzlement of its funds, it is not necessary for the State to show that any personal benefit actually accrued to him by his act in permitting a customer to obtain from the bank thousands of dollars, without security, for use in ventures of the most hazardous nature and of exceedingly doubtful outcome, but his fraudulent intent, and the element of conversion, is established by showing those facts and the further fact that he covered up, or directed his subordinates to cover up, the various transactions by carrying overdrafts of the customer as cash items.

4. ————: **Cashier's Checks Equivalent of Money.** A charge that the cashier of a bank embezzled United States money is sustained by proof that with fraudulent intent he gave to a customer cashier's checks for the same amount, where there was money in the bank and the cashier issued the checks against it and delivered them to the customer, and the customer received money or credit upon

them, and thereby the amount of money in the bank or on deposit to its credit in other banks was diminished in an equal amount. And likewise the charge is sustained by proof that the customer gave his check on the bank, payable to himself and duly indorsed by him, and the defendant cashier gave his cashier's check for an equal amount, payable to the customer, which was paid after having been indorsed by the customer and other banks and companies, and the teller held the customer's worthless check as a cash item, under instructions from defendant. In either case, the cashier's checks were merely the vehicle or device employed by defendant to withdraw actual money from the bank.

5. ———: Instruction: Assumption of Guilt. An instruction for the State telling the jury that if they find that defendant, "after the commission of the crime alleged in the indictment," fled from his usual place of abode, etc., "they may take this fact into consideration in determining his guilt or innocence," is erroneous, because it assumes the commission by defendant of the crime charged, the defense being that the transactions were not criminal offenses and that no crime had been committed.

6. ———: ———: Flight: Comment. The giving of a proper instruction on the subject of flight is not a comment on the evidence.

7. ———: ———: Evidence of Other Similar Transactions. Where the defendant cashier admits that a customer of the bank obtained large sums of money and that the withdrawal of at least a part thereof was covered by cash items which concealed the actual transactions, and contends that the customer put up collateral, that the transactions charged to be embezzlement were regular and that he received no personal benefit from them, other transactions of a similar character at about the same time with persons other than said customer are admissible to characterize the transactions for which he is being tried; and evidence of such other transactions having been admitted, it is likewise proper, and for the same reason, to instruct the jury that "evidence tending to prove other offenses of embezzlement than those alleged in the indictment, you. can consider only for the purpose for which it was admitted, that is, to show the intent with which defendant acted with the money for the embezzlement of which he is now on trial." Nor was it necessary to prove that such other transactions were acts of embezzlement beyond a reasonable doubt.

8. ———: ———: Tendency to Prove: Assumption of Fact. An instruction telling the jury that "the State has, in this case, introduced evidence tending to prove other offenses of embezzlement other than that alleged in the indictment" does not assume that such other offenses were committed. It is for the court to say whether the testimony did "tend" to prove other offenses.

State v. Meininger.

9. ———: ———: Abstract Law. An instruction which is a mere abstract statement of the law relating to the duties of boards of directors of state banks should not be given in the trial of a bank cashier for embezzlement.

10. ———: Loaning Money: Absence of Fraudulent Intent. The mere loaning of the bank's money by its cashier without the consent of its board of directors does not constitute conversion of its money to his own use, in the absence of fraudulent intent to so convert it; but the cashier is guilty of embezzlement if he knowingly and with fraudulent intent turns over the bank's money to others without authority and without security, even though he receives no benefit of any sort therefrom.

11. INTENT. Intent can be shown by facts and circumstances or by direct evidence.

Citations to Headnotes: 1, Criminal Law, 16 C. J. par. 2170; 2 to 4, Embezzlement: 2, 20 C. J. par. 40; 3, 20 C. J. pars. 40, 83; 4, 20 C. J. par. 72; 5 to 9, Criminal Law: 5, 16 C. J. par. 2330; 6, 16 C. J. pars. 2311, 2349; 7, 16 C. J. pars. 1159, 1193, 2325, 2426; 8, 16 C. J. pars. 2294, 2334; 9, 16 C. J. par. 2482; 10 and 11, Embezzlement: 10, C. J. par. 40 (1926 Anno); 11, 20 C. J. par. 83.

Appeal from Franklin Circuit Court.—*Hon. R. A. Breuer,* Judge.

REVERSED AND REMANDED.

*James Booth, Cole & Jenny, Harvey & Baer* and *Anderson, Gilbert & Wolfort* for appellant.

(1) A charge that defendant obtained the money is not sustained by proof that someone else got it. State v. McBrien, 265 Mo. 594, 611; State v. Bowman, 247 S. W. 145. The Constitution, art. 2, sec. 22, requires defendant to be informed of the nature and cause of the accusation. (2) A charge that United States money was embezzled is not sustained by showing that other property may have been. The statute prescribes what money means. Sec. 3904, R. S. 1919; State v. Fischer, 297 Mo. 164, 174; State v. Castleton, 255 Mo. 201, 210; State v. Dodson, 72 Mo. 285; State v. Peck, 299 Mo. 454, 461. (3) Instructions which assume facts are erroneous. State v. Creed, 252 S. W. 678; State v. Fish, 195 S. W.

997; State v. Mills, 272 Mo. 526. (4) Instructions which comment on the evidence are erroneous. State v. Swarens, 294 Mo. 139; State v. Hogan, 242 S. W. 387; State v. Malloch, 269 Mo. 235; State v. Ferguson, 221 Mo. 524. (5) Conflicting instructions are erroneous. State v. Cable, 117 Mo. 386; State v. Harrell, 97 Mo. 110. (6) Testimony to impeach is not admissible where no foundation is laid while the witness is on the stand. State v. Curtner, 262 Mo. 214.

*Jesse W. Barrett*, Attorney-General, and *Henry. Davis*, Assistant Attorney-General, for respondent.

(1) The order overruling the plea in abatement is a finding that the allegations in support thereof are untrue. As it was a finding of fact upon conflicting testimony this court will not interfere with it. State v. Rowland and Sanders, 271 Mo. 88; State v. Sharp, 233 Mo. 269, 283; State v. Smith, 214 Mo. 245, 256. (2) The trial court properly overruled the motion to quash the indictment as it fully informs the defendant of the charge which he is to meet and is in approved form. State v. LaRew, 191 Mo. 192, 197; State v. Moreaux, 254 Mo. 398. (3) It was not necessary to prove that one who has illegally taken the funds of another person received any benefit from the transaction in a prosecution for embezzlement. State v. Crosswhite, 130 Mo. 358, 364; State v. Shour, 196 Mo. 202, 221; State v. Britt, 278 Mo. 510; State v. Pate, 268 Mo. 431; State v. Teasdale, 120 Mo. App. 692; State v. Coster, 170 Mo. App. 539; State v. Wilcox, 179 S. W. 481; Bishop's New Criminal Law, sec. 325, par. 2; State v. Ross, 55 Ore. 450, 227 U. S. 150; Russell v. State, 112 Ark. 282. (4) It was proper to make proof of embezzlement of money by introducing in evidence the defendant's check as cashier of the Night & Day Bank for $28,350 and the check of Katz for that amount to prove that that sum of money was taken from the bank without the bank's consent. This was not evidence of the embezzlement of the check, but of a misap-

propriation of funds of the bank. The checks introduced were merely the means by which the money was procured. State v. McCawley, 180 S. W. 871; State v. Martin, 230 Mo. 680. (5) As there was but one count of embezzlement in the indictment charging the conversion of a certain sum of money, it was proper to introduce evidence of appropriations of different amounts on different dates to make up the total charged in the indictment. An embezzlement may consist of a continuous series of conversions. State v. Julin, 292 Mo. 264. (6) The trial court did not err in overruling the motion of appellant to require the prosecution to elect upon which transaction mentioned in the evidence the prosecution would submit the case to the jury. State v. Julin, 292 Mo. 264. (7) The instruction limiting the purpose of evidence introduced by the State of other similar offenses committed by defendant to the ascertainment of the intent of the defendant was proper. State v. Wilson, 223 Mo. 156, 171. (8) An instruction which tells the jury that certain acts introduced in evidence on the question of intent tend to prove embezzlement, is not a comment on the evidence.

DAVID E. BLAIR, J.—The indictment in this case was in two counts, one charging larceny and the other embezzlement of the moneys of the Night & Day Bank of St. Louis. The case was removed from the city of St. Louis to Franklin County upon change of venue. At the trial the State elected to stand upon the embezzlement count, and the defendant was found guilty thereunder and his punishment was assessed at imprisonment in the State Penitentiary for a term of five years. He was duly sentenced upon the verdict and has appealed.

The learned Attorney-General has made a very fair statement of the facts in the case and we quote same as follows:

"The evidence for the State shows that on the 7th day of January, 1922, and for many years prior thereto, appellant was the cashier of the Night & Day Bank, a

banking corporation of the city of St. Louis, Missouri; that as such cashier he had the custody and control of the funds of the bank, had full supervision of the books and of the employees of the bank; that all the employees received their training and instructions from him and followed to the letter the instructions which he gave to them; that the Night & Day Bank had originally a capital stock of $150,000, and at one time had a surplus of $95,000.

"Under appellant's instructions deposit slips were made out crediting persons or corporations with cash deposits in many instances when no cash had been deposited. These were held by tellers as 'cash items.' In many instances credit was given to persons or corporations through the use of these 'cash items' when such persons or corporations had not actually deposited any money in the bank and had given no evidence of indebtedness or securities, and the only papers which the bank had to show the transactions were these 'cash items' slips. The persons and corporations who obtained cash and credit in this way were either close personal or business friends of the appellant, or were corporations in which he was financially interested. The Southern Motor Company which obtained credits or cash in excess of $30 at different times was owned entirely by the appellant except for two or three shares of its stock.

"At one time immediately preceding an examination of the Night & Day Bank by the State Banking Department appellant instructed the employees of the bank so to arrange the books as not to show a deposit of $200,000 by the Treasurer of Missouri. This actual deposit of $200,-000 by the Treasurer of Missouri was used to cover the 'cash items' then being carried so as to show instead of cash item slips of paper the actual cash.

"The Night & Day Bank was closed on the 5th day of January, 1922, by order of the State Banking Department, and the Commissioner of Finance took charge of it for the purpose of liquidation. At that time there should have been $869,000 actual cash on hand. There

was, however, only $104,000 there. The day before the Finance Commissioner took charge of the bank appellant could not be found at the bank, at his room at the hotel where he stayed, or at his usual eating place. He left St. Louis and after the newspapers reported that he had been indicted he made arrangements with the circuit attorney from Belleville, Illinois, to surrender himself and to answer to the indictments.

"The bank tellers explained that the cash items slips were memoranda made by them under instructions from the appellant and held by them in lieu of cash and counted as cash. From time to time during the year of 1921 cash item slips were made up by the tellers aggregating a total of $174,677.11. On December 19, 1921, the head teller was instructed to charge off these various cash items to 'general items.' On the morning of that day, counting the cash items as cash, the books showed $213,-230.18 as cash. When the charge-off was made the actual cash on hands was $38,553.06. A part of the $174,-677.12 was drafts or checks which had been returned to the bank from some other bank, because of insufficient funds, and held as cash items by the Night & Day Bank under the instructions of appellant.

"Cash item slips were introduced in evidence aggregating $116,450, which money was shown to have been paid to one Meyer Katz. Other items in excess of $30 were shown to have been paid to the Southern Motor Company, which was principally owned by the appellant. Some of these cash item slips were overdrafts of the Southern Motor Company and they were held as cash under the appellant's instructions. Two of the overdrafts were introduced in evidence. One was for $830.83 and the other for $375. One cash item slip credited to the Briscoe Motor Sales Company was $1,800, another credited to the Briscoe Liberty Motors was $2,000; one for the Southern Motor Company was $3,258.83, another credited to the Southern Motor Company was $1,764.85; one for P. A. McDermott for $5,659.33.

"Seven drafts drawn on the Night & Day Bank by appellant as cashier on other banks, in various sums up to $100,000, were found in appellant's safety deposit box. They had not been used.

"Appellant's evidence was as follows: Meyer Katz testified that he never gave appellant anything (for making loans to him and that he never promised appellant anything. He was in the river equipment business, had invested a great deal of money in barges, and river craft; that he had a contract to haul oil on a river in Mexico; that he obtained a great deal of money from the Night & Day Bank to finance his venture; that he left with appellant notes and an oil contract as collateral security; that he had insurance on two boats in the sum of $104,000; that these boats were lost and that he gave the appellant the policies to collect the insurance; that he had $40,000 insurance on another boat which he lost, and that he gave the policy to the appellant to collect; that he gave the bank mortgages on five boats; that by agreement with appellant the insurance policies were turned over to Katz's attorney for collection; that he had a contract with an oil company in Mexico to transport oils for them down the Mexico River; that the oil in the wells of the company turned to salt water and that he couldn't make money and that the contract could not be carried out. He had expected to make $40,000 to $50,000 per month hauling this oil, and all of this had been explained to the appellant; that he owed the Night & Day Bank $188,750 when it closed.

"Katz's attorney testified that he prepared a mortgage and delivered it to Katz some time before the bank closed. He said that Katz told him he had given a bill of sale and assigned insurance policies for the payment of $188,750 and that he owed the bank in excess of $300,000. Katz said that he would give notes for the difference if it would free Meininger as Meininger was his friend.

"Appellant testified that Meyer Katz owed the Night & Day Bank $35,000 in the early part of 1921; that he

needed more money and got it from time to time from the bank. Appellant said that he had no interest in the boats belonging to Katz; that he got no money from Katz or any promises from him to pay money, and that he received none of the money paid to Katz through anyone else; that Katz gave mortgages and insurance policies for $147,000 as security for the money which he obtained from the  bank. He testified that the mortgages and insurance policies were in the bank at the time it was taken over by the Finance Commissioner.

"Several witnesses testified that the appellant bore a good reputation for truth and veracity.

"In rebuttal for the State an attorney for the Finance Commissioner testified that Katz, according to the books of the bank, owed the bank over $300,000. He said that Katz denied owing it, but stated that he would sign the note if it would square up everything for appellant as appellant had befriended him. This attorney found no security or collateral of any kind except the assignment of the insurance policies and bill of sale, which were made on the 7th of January, 1922, to the Finance Commissioner, and a discounted note for $30,000.

"In sur-rebuttal, an attorney for the appellant testified that he saw a blank note and collateral in the bank on or about the 17th day of January, 1922."

A great many assignments of alleged error were made in the motions for new trial and in arrest of judgment. With commendable frankness counsel for appellant say in their brief:

"The points we desire to urge for reversal are:

"1. The failure of proof in that the indictment charges that the defendant converted to his own use United States money of the Night & Day Bank, whereas the proof does not show any conversion to defendant's own use.

"2. The failure of proof in that the indictment charges United States money was embezzled and the proof did not so show.

"3.   Errors in giving instructions which assumed facts and commented on the evidence and in giving conflicting instructions.

"4.   Errors in the admission of testimony.

"5.   Error in overruling motion for continuance, plea in abatement and motion to quash.

"6.   Error in overruling motions to elect."

I.   No error was committed in overruling appellant's motion to require the State to elect upon which transaction, shown under the embezzlement count of the indictment, the case should be submitted to the jury. Several items of moneys of the bank turned over by appellant to Meyer Katz without any security where the transactions were covered by cash items were shown by the State. Under the rule laid down in State v. Julin, 292 Mo. 264, l. c. 271, and cases cited therein, no error was committed in such ruling.

*Motion to Elect.*

The same considerations dispose of the assignments of error in overruling appellant's motion to quash the indictment and plea in abatement.

II.   The first proposition seriously contended for in appellant's brief is that the proof does not sustain the charge that appellant converted money of the bank to his own use; that proof that Katz got the money does not amount to conversion of the money of the bank by appellant. In other words, the contention is that the proof fails to show that appellant got any personal benefit from the money which was turned over to Katz, but, on the contrary, shows that appellant got nothing out of any of the transactions and, therefore, the proof does not sustain the charge that appellant converted money of the bank to his own use.

*Conversion: Aiding Customer to Appropriate Bank's Money.*

From the instructions given by the trial judge it is evident that he submitted the case to the jury upon the theory that appellant did not convert the money of the

bank to his own use, unless he actually obtained part of said money or received some benefit therefrom. The trial court doubtless took the view that the circumstances in the case tended to show that appellant actually received and converted to his own use a part of the money turned over to Katz or received some benefit therefrom and that such fact may fairly be inferred from all the circumstances in evidence.

However we do not think it necessary for the State to show or for the jury actually to find that appellant in fact got any of the money. Appellant relies upon State v. Bowman, 247 S. W. (Mo. Sup.) 143, and State v. McBrien, 265 Mo. 594. In both cases the informations charged the crime of obtaining money under false pretenses. In the McBrien case it was charged that defendant obtained $150 by certain false and fraudulent representations. The proof showed that defendant got only twenty-five dollars of the money and that the balance was deposited by the complaining bank to the credit of defendant's wife. This court held that the proof that $125 of the money was deposited to the credit of the wife did not support the charge in the indictment that defendant obtained thirty dollars or more and that defendant could not be convicted of a felony on that evidence. There was the further disputed fact in evidence in that case that defendant got an additional ten dollars of the money. The trial court was convicted of error in failing to instruct upon the misdemeanor of obtaining less than thirty dollars.

In the Bowman case, the information charged the purchase of stock through false and fraudulent representations and the payment of ten thousand dollars to defendant. The proof showed that the prosecuting witness purchased stock from the bank, of which defendant was trustee, and that the money was deposited to the credit of that company. Five hundred dollars of the money was afterwards drawn out upon the check of the officers of the company and turned over to defendant and seventy-five hundred dollars was drawn from the bank upon

the check of the company, payable to said bank for a draft of the same amount. This draft was delivered to defendant by one of the other officers of the company to be expended by him for the purposes of the company. The proof entirely failed to sustain the charge that defendant obtained from the prosecuting witness the money charged to have been fraudulently obtained by him.

Both the cases differ from the case at bar in that here plaintiff himself actually took the money from the bank and turned it over to Katz. There is no direct proof that appellant actually received any of the money for himself or that he received any benefit personally by permitting Katz to obtain the same. The physical act of taking the money from the bank, or, what amounts to the same thing, the responsibility of appellant for Katz being permitted to obtain it, was the act of appellant. Did the fact that he obtained no part of the money or any benefit therefrom, if he did not do so, amount to a failure to prove the crime charged? We think not.

The statute, under which the prosecution is had, requires that appellant must have converted the money to his own use. In State v. Wilcox, 179 S. W. (Mo. Sup.) 479, this court in banc, speaking through BLAIR, J., said: "There was no error in instructing that the mere fact, if it was a fact, that the proceeds of the check went to the Bloomfield Mercantile Company did not constitute a defense. The law is not concerned with the use to which the fruits of crime are put." The charge was embezzlement by a bank cashier, and it was the theory of the State that defendant drew the check on his bank in favor of another bank in payment of his personal indebtedness and that defendant afterwards carried the check as a cash item. Further discussing the meaning of the word "conversion," the court said: "It is enough to say to the jury in a criminal case that conversion is any dealing with the property of another which excludes the owner's dominion."

In State v. Shour, 196 Mo. 202, the information charged that defendant converted the money of the owner

to his own use.  In an instruction the trial court had told the jury that if it found, among other facts, ''that the defendant or another with his knowledge and consent, did then and there fraudulently convert to his own or such other person's use,'' etc.  The instruction was approved. In discussing the evidence, Fox, J., said:

''The testimony in this case indicates that but two persons had access to the funds of this association, one the defendant, the other his private clerk.  It certainly would be a humiliating confession upon our criminal jurisprudence if the defendant in this case permitted his clerk or some other person, with his knowledge and consent, to convert this money to such other person's use, with the fraudulent intention on the part of the defendant that it should be converted and that the association should be deprived thereof, that he could not be convicted of the offense of embezzlement.''

In State v. Britt, 278 Mo. 510, l. c. 514, it is said: ''When one accused of embezzlement . . . spends the money, or sells or disposes of *or puts out of his control* the property of another which came into his hands as a bailee, . . . such acts are circumstances tending to show conversion.'' (Italics ours).

Of course such acts must always be found to have been done with fraudulent intent to deprive the owner of his property.

In State v. Ross, 55 Ore. 450, defendant was charged with larceny under the statute of Oregon which provided that, if any person shall receive money for the State or have same in his possesion and shall in any way convert same to his own use, such person shall be deemed guilty of larceny.  This sort of an act is embezzlement under our statute.  The court said:

''Counsel for defendant also urge that the evidence does not tend to establish a conversion of the money by defendant to his own use, namely, that it is not sufficient to show that the funds were converted for the benefit of the Trust Company, but must have been to the personal advantage of defendant.  We do not so understand the

law of conversion. The statute uses the expression 'shall in any way convert to his own use any portion thereof.' That is what we understand the term 'conversion' to mean, when applied to a wrongful appropriation for which trover will lie, namely, assuming upon one's self the property and right to dispose of another's goods without authority.''

In Russell v. State, 112 Ark. 282, defendant was charged with embezzlement by converting certain money to his own use. The trial court instructed the jury that it was not necessary in order to warrant a conviction that defendant should have used the money, or any part of it, for his own purposes, but was guilty if he permitted others to use it. In disposing of the case the Supreme Court of Arkansas said: ''And it would be immaterial whether he became personally interested in this company, or had loaned the money to others who were interested in that company, or had loaned the money to the company itself, as in any of these cases this use of the money would be a conversion of it to his own use.''

From the foregoing, the rule, as applied to the instant case, appears to be that it was not necessary to show that appellant got any personal benefit by permitting Katz to secure from the bank thousands of dollars without security (as appears from the State's evidence) for investment in ventures of the most hazardous nature and of exceedingly doubtful outcome. The fraudulent intent of appellant is inferable from the fact that he covered up, or directed others to cover up, the various transactions by carrying overdrafts of Katz as cash items.

III. Appellant contends that there was another failure of proof, in that the indictment alleged the embezzlement of United States money and the proof did not so show. There is no merit in the contention. The cashier's checks, shown to have been given by defendant to Katz, were merely the vehicles by which the money

Cashier's Checks Equivalent to Money.

was withdrawn from the bank and put in possession of Katz. A certain amount of money was in possession of the bank. Checks were issued against the same and delivered to Katz. They were the equivalent of money because Katz received money or credit upon the same and, by reason of such checks, the amount of money on hand in the bank or on deposit to its credit in other banks was diminished in that amount. The diminution of cash in the bank was covered by the use of cash items. Take the item of $28,350. Katz gave his check on the Night & Day Bank in that amount, payable to himself, and duly indorsed by him. Appellant gave his cashier's check on the bank in the same amount, payable to Katz, which was paid December 19, 1921, after having been endorsed by Katz, the Direct Navigation Co., Lumbermen's National Bank of Houston, Texas, and Federal Reserve Bank of St. Louis. The teller got the worthless check of Meyer Katz and held it as a cash item, under instructions from appellant. Thus the actual cash in the bank, plus cash item, made the *supposed cash* in the bank appear to be the amount it actually was before the cashier's check was issued. The checks used were simply the device employed to withdraw the actual money from the bank. Thus the conversion was of the money and not of the check. That this was a conversion of money is supported by State v. McCawley, 180 S. W. (Mo. Sup.) 869, l. c. 871; State v. Martin, 230 Mo. 680, l. c. 699, and State v. Laughlin, 180 Mo. 342, l. c. 361.

There is nothing in the cases cited and relied upon by appellant contrary to the foregoing. In State v. Fischer, 297 Mo. 164, the information charged that defendant embezzled "money, goods, rights in action, checks and personal property." It was held that none of the property, except the money, was sufficiently described to constitute the crime of embezzlement and that the money was not separately charged to have been thirty dollars or more. The aggregate value of the money and other property was charged to have been in excess of thirty dollars. Defendant was convicted of a felony and

306 Mo.—44

the judgment was reversed because the information was deemed not to charge a felony sufficiently. The case does not help appellant in any way. It was not a case where embezzlement of money was charged and the proof showed embezzlement of a check.

In State v. Castleton, 255 Mo. 201, the defendant was charged with embezzling money which was the proceeds of a note and not charged with embezzling the note itself. The proof showed embezzlement of the note. The defendant having said note in his possession had put it up as collateral upon his own loan, thus converting the note to his own use.

In State v. Dodson, 72 Mo. 283, defendant was charged with embezzling horses and it was held that proof tending to show embezzlement of the proceeds of the horses was inadmissible and instructions based on such evidence erroneous. The court certainly did not intend to say that a sale of the horses by defendant could not be shown as tending to prove embezzlement of the horses by him. If the proceeds were honestly received by defendant, for account of the owner, and he thereafter converted such proceeds to his own use, such proof would not sustain the charge of embezzling the horses.

In State v. Peck, 299 Mo. 454, the defendant was charged with embezzling certain certificates of stock. Under the contracts between defendant and prosecuting witness, the defendant had the right to sell the stock and to apply the proceeds just as he did. The facts made out a case of debtor and creditor and not one of bailor and bailee. The case certainly is not in point here.

IV. (a) Appellant contends that error was committed in giving several of the instructions. Instruction Six is one of them. It was as follows:

"Flight of the defendant is a circumstance to be taken into consideration in connection with all the other

**Assumption of Guilt.** facts and circumstances in evidence, and if the jury find and believe from the evidence that the defendant, *after the commission of*

*the crime alleged in the indictment,* fled from his usual place of abode and employment for the purpose of avoid· ing arrest and trial for said offense, they may take this fact into consideration in determining his guilt or inno cence.'' (Italics ours).

We are forced to the conclusion that the giving of this instruction was error, because it assumed the com mission by appellant of the crime charged in the indict ment. The defense was that the transactions detailed were not criminal offenses, but that they were regular and that Katz put up collateral and that appellant re ceived no personal benefit, etc. The instruction must be held to be erroneous under State v. Mills, 272 Mo. 526, l. c. 534. There FARIS, J., said:

''I. The instruction given by the court on flight read thus:

'' 'The court instructs the jury that flight raises the presumption of guilt, and if you believe from the evi dence that the defendant, after having stabbed and killed Philip Carpenter, as charged in the information, fled the country, and tried to avoid arrest and trial, you may take that fact into consideration in determining his guilt or innocence.'

''It is clear that this instruction by its terms assumes defendant's guilt and begs the question upon the most vital issue in the case. It was the province of the jury to find and say whether the defendant 'stabbed and killed Philip Carpenter,' and not the province of the court to assume this fact as true. If the stabbing had been ad mitted by defendant and his defense had been self-defense, no harm would have flowed from this assump tion. But here defendant unequivocally denied that he stabbed deceased, and while the great weight of the tes timony, and even his own extra-judicial confessions, un erringly point to the falsity of his denial, yet we have uniformly held that the instructions must take their color from the evidence, and that it is error to disregard the defendant's testimony (State v. Weinhardt, 253 Mo. 629) unless the physical facts contradict such testimony be-

yond dispute or cavil. If, however, in the instant case the jury had seen fit to believe the testimony of the defendant, he was guilty of no crime and must have been acquitted. It was defendant's right to have the jury pass upon this vital issue as to who stabbed the deceased, and the court could not invade that right and assume that defendant did it. [State v. Vaughan, 141 Mo. 514; State v. Lee, *ante,* p. 121, 182 S. W. 972.]'' See also State v. Fox, 276 Mo. 378, l. c. 384; State v. Jordan, 306 Mo. 3.

The learned Attorney-General suggests that if the instruction had used the words ''the defendant, after committing the crime alleged in the indictment,'' instead of the words we have italicized above, it would have been an assumption of guilt of the defendant. We confess our inability to grasp the distinction sought to be made. This is not a case of admitted commission of a crime by someone and where the only question to be determined by the jury is whether defendant or another committed it. The question here is whether or not the instruction assumed that a crime had been committed. We think it did assume such disputed fact.

The giving of instruction numbered six in such form constituted reversible error.

The instruction is also attacked as a comment upon the evidence. Instructions upon the subject of flight have been approved in cases too numerous to require citation and, so far as we are aware, no case was ever reversed **Comment.** for the giving of such instruction *in proper form,* even including the supposed *presumption of guilt* arising from unexplained flight, until the very recent case of State v. Hogan, 252 S. W. (Mo. Sup.) 387. Following State v. Swarens, 294 Mo. 139, 241 S.W. 934, the flight instruction in Hogan's case was held to be erroneous because it told the jury that flight raised a presumption of guilt.

In the case of State v. Jordan, supra, decided by the court in banc at the present term, it was held that ''the mere fact that the instruction deals with flight does not

make it a comment on the evidence as that word is used in the statute." The instruction we have before us does not offend as did the one in Hogan's case and, but for the assumption of the commission of the crime, we think it was in proper form and its giving justified by the evidence.

(b) Instruction Five was as follows:

"The court instructs the jury that you cannot convict the defendant for the embezzlement of any money other than that named in the indictment in this case.

Other Similar Acts.

The State has, in this case, introduced evidence tending to prove other offenses of embezzlement than that alleged in the indictment, which you can consider only for the purpose for which it was admitted, that is, to show intent with which the defendant acted with respect to the money, for the embezzlement of which he is now on trial."

This instruction is criticised on the ground that the alleged other offenses of embezzlement were not shown to have been embezzlement and because the instruction assumed that such offenses were embezzlement.

We think admission of evidence tending to show other acts of embezzlement was proper in this case. Appellant admitted that Katz obtained large sums of money and that the withdrawal of at least part thereof was covered by cash items which concealed the actual transactions. Appellant contended that Katz put up collateral and that the transactions were regular and that the appellant got no benefit. It was, therefore, proper to show other transactions of similar character at about the same time with persons other than Katz. Such other transactions were admissible to characterize the acts for which appellant was being tried. [State v. Meyers, 82 Mo. 558; State v. Turley, 142 Mo. 403; State v. Wilson, 143 Mo. 334; State v. Wilson, 223 Mo. 156.]

There was sufficient proof respecting such other alleged embezzlements to justify the trial court in submitting to the jury the facts in relation thereto for the purpose of proving the fraudulent intent of appellant in the

transactions for the commission of which he was being tried. It was not necessary to prove such other transactions beyond a reasonable doubt. In State v. Hyde, 234 Mo. 200, l. c. 250, FERRISS, J., said:

"We do not mean to say that the evidence upon such preliminary hearing must prove beyond a reasonable doubt that the other crime had been committed, but that there should appear - substantial evidence sufficient to take a case to a jury. A satisfactory precedent is found in the case of Commonwealth v. Robinson, 146 Mass. 571, where such preliminary hearing was had. As to the degree of proof on such hearing, the court said (l. c. 581): 'Where, in a case like the present, the admissibility of testimony depends upon the determination of some prior fact by the court, there is no rule of law that, in order to render the testimony admissible, such prior fact must be established by a weight of evidence which will amount to a demonstration, and shut out all doubt or question of its existence. It is only necessary that there should be so much evidence as to make it proper to submit the whole evidence to the jury.' "

Nor do we think Instruction Five is subject to the criticism that it assumed the commission of such other offenses. The trial court told the jury that the State "introduced evidence tending to prove other offenses of embezzlement than that alleged in the indictment." If such testimony had not *tended* to show other offenses, the judge would doubtless not have admitted it at all, or if he had heard it and concluded that such testimony did not *tend* to prove other offenses of embezzlement, he doubtless would have stricken it out and told the jury to disregard the same. It was for the trial court and not the jury to say whether the testimony had such tendency and the very fact that the trial judge admitted such testimony was an assurance to the jury that the testimony had such tendency. The court did not err in telling the jury that the testimony had such tendency.

*Assumption of Fact.*

(c) Instruction Seven is challenged as being erroneous. It was an abstract statement of the law relating to the duties of boards of directors of state banks. The instruction had no proper place in the case. Since we have concluded that the judgment must be reversed and the cause remanded for error in the giving of Instruction Six, it becomes unnecessary for us to consider whether the giving of Instruction Seven would constitute reversible error. We are clear that it should not be given upon retrial, for the reason that it is a mere abstract statement of law.

Duty of Directors.

Appellant contends that conflict exists between said Instruction Seven and certain instructions given at his request. Such alleged conflict will not be engendered if an instruction similar to Instruction Seven is not again given. What we have said under Paragraph II demonstrates that said instructions given at appellant's request were not altogether correct. It was not necessary for the jury to find that the appellant appropriated said money to himself in the sense that he personally obtained any benefit therefrom. Concededly, the mere loaning of the bank's money to others without authority from the board of directors did not constitute conversion of the bank's money to his own use *in the absence of fraudulent intent so to convert such money.* But appellant was guilty of embezzlement if he knowingly and with fraudulent intent turned over the bank's money to others without authority and without security to the bank, even though appellant himself received no benefit of any sort therefrom.

(d) Instructions numbered one, three, four and ten are also challenged as erroneous. But appellant does not point out in his brief the manner of their offending.

Instruction One was the main instruction which embodied the facts which the jury must find to authorize conviction. These included the date of the offense, venue thereof, the incorporation of the bank, appellant's em-

**Instruction Covering Case.** ployment therein, his age, his possession of the money in the bank and that he converted to his own use thirty dollars or more of such money with fraudulent intent to convert same to his own use, together with the statement of the appropriate punishment to be inflicted, if the jury found him guilty. The instruction follows the language of the statute and we see nothing wrong with it.

Instruction Three merely told the jury that intent could be shown by facts and circumstances or by direct evidence. Number four was the usual instruction on **Other Instructions.** the amount and character of proof required to convict upon circumstantial evidence. Number ten related to credibility of witnesses. All are in frequently approved form.

V. State's witness T. E. Francis was permitted to testify in rebuttal as to certain statements made by Meyer Katz. The appellant contends this was error, **Impeachment.** because no foundation was laid by asking Katz about such alleged statements. John A. Hope, attorney for Katz, was on the witness stand and his testimony tended to show that certain collateral, belonging to Katz and in possession of the bank prior to the time the Commissioner of Finance took charge of the bank, had been turned over to him for collection for the account of the bank. The State was trying to show that Katz was contending that he did not owe the bank *all* the money, for which he gave notes, and that he gave the notes *in the amount in which they were given* to help out his friend the appellant, regardless of the amount he owed the bank. Hope was asked as a witness if Katz had not so stated in the presence of himself and Francis after the bank was closed. Hope testified that Katz neither admitted nor denied that he owed the money. Hope admitted that Katz did say he did not object to giving his note if that would help the appellant. The testimony of Francis tended to show that Katz stated he would be glad to sign a note for the amount it was claimed

he owed the bank "if it would help Mr. Meininger." We are inclined to think that the testimony of Mr. Francis left the matter quite in the situation testified to by Mr. Hope, to-wit, that Katz neither admitted nor denied he owed the bank the money claimed. However, we think the State had the right *to contradict* Hope, if it could, even though such contradiction indirectly *involved the impeachment* of Katz upon a matter concerning which he was not asked about.

The record shows that the trial judge refused to strike out the testimony of Francis and exception was saved. We think the testimony should have been stricken out, as it did not contradict Hope. Whether such refusal to strike out the testimony was reversible error, we need not consider, since the case must be reversed for another reason.

VI.   One of the assignments of error is that the trial court improperly denied appellant's application for continuance. As this question will not likely arise upon retrial, it is not necessary to lengthen the opinion further in its consideration.

Continuance.

VII.   For the error pointed out in giving Instruction Six, it is ordered that the judgment be reversed and the cause remanded. *White, J.,* concurs; *Walker, J.,* absent.